**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CHARLENE MCFAUL,

                    Plaintiff,                    CASE NUMBER: 06-13080
                                                  HON. MARIANNE O. BATTANI

       v.

FREADA RANDALL-OWENS and
ANDREW JACKSON

                    Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

       Before the Court is Defendants Freada Randall-Owens and Andrew Jackson's

Motion For Summary Judgment (Doc. No. 18).  The Court heard oral argument, and at

the conclusion took this matter under advisement.  For the reasons that follow the Court

**GRANTS IN PART** and **DENIES IN PART** Defendants' motion.

**I.      STATEMENT OF FACTS**

       Plaintiff, Charlene McFaul, worked as a Resident Unit Officer (RUO) at Mound

Correctional Facility (MCF) in Detroit, Michigan.  At the time of the incidents giving rise

to this lawsuit, Randall-Owens was a Resident Unit Manager (RUM) and supervised

McFaul.  Jackson was the Warden.

       When McFaul began working for the Michigan Department of Corrections in

1997, she and Randall-Owens had a good working relationship.  In 2004, their

relationship soured.  In late summer, 2004, while McFaul led a training program entitled

"Promoting a Positive Prison Culture," the two engaged in an angry exchange.  The

parties do not dispute the nature of the exchange although they disagree as to some

specifics. McFaul alleges that Randall-Owens interrupted the session, yelling that it was a "farce" and a "sham." Pl.'s Ex. 2 at 18. McFaul asserts she then asked Randall-Owens to take her seat or leave the session, and Randall-Owens replied, "You don't dismiss me, you can't dismiss me," and that she would, "See [McFaul] later," before leaving the room. Pl.'s Br. at 4-5. Although Defendants concur with most of McFaul's recollection of the verbal exchange, Randall-Owens claims that she responded that she would not leave until she was ready, but she left soon after, when Jackson asked her to do so. Pl.'s Ex. 3 at 5.

Anthony McClendon, a prisoner at MCF, entered McFaul's unit in September of 2004. Prior to McClendon's arrival, an officer from McClendon's previous facility warned McFaul that several guards had "issues" with the prisoner. Pl.'s Ex. 2 at 6-7. Within weeks McFaul noticed that McClendon would stare at her constantly, walk behind her during rounds, try to engage her in conversation and "come on" to her, and would approach her to ask for frivolous items and favors. Id., at 4-5.

Although McClendon never made any physical threats or came within any more than a "couple arms' lengths" of McFaul, she believed her safety was threatened, and she walked around the unit clenching a pen or keys so that she could defend herself if attacked. Id., at 9. His record includes numerous assault convictions, second degree murder, criminal sexual conduct, and armed robbery. Defs.' Ex. 3 at 2-4. McFaul alleges that in late September of 2004, she asked Randall-Owens to transfer McClendon to another unit due to his behavior. She handed Randall-Owens a

completed transfer form. Transfer at the request of an officer was a common practice at MCF; however, Randall-Owens refused to sign the transfer request form.

The relationship worsened in October of 2004, when McFaul cooperated in an investigation of Randall-Owens. McFaul claims Randall-Owens responded by confronting and intimidating Plaintiff. Defs.' Br. at 5.

In December 2004, McFaul again approached Randall-Owens and requested that McClendon be moved. Randall-Owens again denied the request. At the end of her shift, McFaul went to Deputy Warden Jeff White with her request. White testified that he took Plaintiff's request seriously "enough to transfer [the] inmate out of that unit." Pl.'s Ex. 4, White Dep. at 23. White knew McClendon and characterized McClendon as a "stalker" with an "extensive history of being violent with females." Id., at 18. According to White after the inmate was transferred, McFaul returned and "indicated that the prisoner had been moved right back into the same cell." Id., at 33. White subsequently questioned Randall-Owens about the move, and Randall-Owens told White to talk to the Warden. Id., at 33-4. White did ask Jackson about the situation. According to White, Jackson "blew it off" and "washed his hands of it." Id., at 34. White added that Jackson replied, "It's not our job to protect officers." Id., at 6. White testified that he believed Randall-Owens authorized the move on a day White was not at work. Id., at 36. If an assistant deputy warden was not there, "she could have "ma[d]e the move herself." Id., at 36.

Although Plaintiff could not recall whether McClendon was ever moved, he was definitely in McFaul's unit the day before and the day of the assault. Defs.' Ex. 2 at 19-

22.  On January 25, 2005, McFaul was on duty in unit 700B with Officer Michael

Edwards.  At approximately 6:45 a.m., when the prisoners were called to breakfast,

Edwards left the unit to get a cup of coffee.  Pl.'s Ex. 8 at 2.  While Edwards was

absent, McClendon approached McFaul and made a crude comment to her.  In

response, McFaul wrote him a major misconduct ticket for insolence.  Defs.' Ex. 2 at 24-

25.  Because McClendon became enraged, McFaul radioed for assistance.  Before

assistance arrived, McClendon began to punch Plaintiff, who fell to the ground and lost

consciousness.  McFaul suffered a broken arm and head trauma.  She continues to

suffer from shoulder and wrist pain, migraine headaches, convergence insufficiency,

anxiety, and post-traumatic stress disorder.  Pl.'s Ex. 9 at 2, 4-6.  Doctors have found

that she will not be able to return to work as a corrections officer.  Id.

Plaintiff alleges a state-created danger claim under 42 U.S.C. § 1983 and two

state tort claims:  gross negligence and intentional infliction of emotional distress.

Defendants assert that they are entitled to summary judgment on all claims.

## II.    STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment

may be granted when "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a

matter of law."

As the United States Supreme Court has ruled:

> In our view, the plain language of Rule 56(c) mandates the entry of
> summary judgment, after adequate time for discovery and upon motion,

> against a party who fails to make a showing sufficient to establish the
> existence of an element essential to that party's case, and on which that
> party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002). "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002). "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256 (1986). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted) (quoting

BLACK'S LAW DICTIONARY 881 (6th ed. 1979)).  To create a genuine issue of material

fact, the nonmovant must do more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the
> nonmoving party for a jury to return a verdict for that party.  If the
> [nonmovant's] evidence is merely colorable, or is not significantly
> probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50.  "No genuine issue of material fact exists when the

'record taken as a whole could not lead a rational trier of fact to find for the non-moving

party.'"  Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir.

2002)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986)).

The evidence itself need not be the sort admissible at trial.  Tinsley v. General

Motors Corp., 227 F.3d 700, 703 (6th Cir. 2000).  However, the evidence must be more

than the nonmovant's own pleadings and affidavits.  Smith v. Campbell, 250 F.3d 1032,

1036 (6th Cir. 2001).  The mere existence of a scintilla of evidence in support of the

nonmovant is not sufficient; there must be sufficient evidence upon which a jury could

reasonably find for the nonmovant.  Anderson, 477 U.S. at 252.

## III.    ANALYSIS

### A.  Federal Claim

Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State . . . subjects or
> causes to be subjected, any citizen of the United States  . . .
> to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity, or other
> proper proceeding for redress.

42 U.S.C. § 1983. Under the language of the statute, to succeed on a § 1983 claim, a plaintiff must prove that a person deprived him of a federal right and that person acted under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

In this case, it is uncontested that Defendants are state actors. The perpetrator of the attack against Plaintiff, however, was a private individual, not Defendants, a fact that impacts whether a deprivation of a federal right occurred. As a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 197 (1989) (finding that the state did not violate substantive due process when it failed to remove a young boy from his father's custody and the boy subsequently was injured by his father).

There are exceptions to the general rule, including one relevant here--the state-created danger doctrine. In Kallstrom v. City of Columbus, 136 F.3d 1055, 1066 (6th Cir. 1998), the appellate court set forth three elements that a plaintiff must prove to succeed on this claim: (1) an affirmative act that creates or increases a risk; (2) a special danger to which the public at large was not exposed; and (3) the requisite degree of state culpability.

Defendants challenge Plaintiff's ability to show the existence of a genuine issue of material fact as to the first and third elements. They concede that her employment as a prison guard satisfies the second element. The Court examines the merits of Defendants' arguments below.

### 1. Affirmative Act

Only an affirmative act can amount to a violation of substantive due process, because the Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." DeShaney, 489 U.S. at 195.  It is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger.  See Collins v. City of Harker Heights, 503 U.S. 115, 125-29 (1992) (no due process violation where the plaintiff alleged the city failed to properly train or warn its employees of known dangers that resulted in sanitation worker's asphyxiation).  Under governing case law a failure to act or failure to remove a danger does not constitute an affirmative act.

The original placement of McClendon in Plaintiff's unit raises no claim under the due process clause.  Moreover, if Defendants had merely ignored Plaintiff's requests to have McClendon removed from her unit, the standard would not be satisfied.  See Jones v. Reynolds, 438 F.3d 685, 695 (6th Cir. 2006) (failure to stop a drag race was not an affirmative act because the officers did not participate or organize it and therefore did not increase the risk of harm).  That is not what happened here.

The facts viewed in the light most favorable to Plaintiff show that after Deputy White made the decision to remove McClendon from Plaintiff's unit, Randall-Owens either went over White's head or behind his back to return McClendon to Plaintiff's unit. As for Jackson, the facts viewed in the light most favorable to Plaintiff show that he revoked the transfer and authorized McClendon's return to Plaintiff's unit.  An inference

that both Defendants took a proactive role arises from the record.  In any event, here, Defendants' conduct did not end with a decision to maintain the status quo; they did not merely ignore or deny Plaintiff's requests to transfer McClendon, they returned him to her unit.  Because Defendants' conduct can be deemed an affirmative act, the issue becomes whether the action created or increased the risk of private violence to Plaintiff. McQueen v. Beecher, 433 F.3d 460, 465 (6th Cir. 2006).

The Sixth Circuit articulated the framework for analysis in Cartwright v. City of Marine City, 336 F.3d 487, 493 (6th Cir. 2003).  "[T]he question is not whether the victim was safer during the state action, but whether he was safer before the state action than he was after it."  In Cartwright the court found that the first prong of the state-created danger test was not met when police gave an individual a ride, relocating him from one street corner to another, where he was later struck by a car and killed.  Id. It reasoned that because the character of the road that the man was picked up from did not significantly differ from the road he was relocated to, the officers did not increase the risk of harm to the individual, and therefore concluded that the relocation was not an affirmative act.  Id.

At oral argument Defendants maintained that McClendon's return to McFaul's unit placed her in the same situation in the beginning as in the end, and what happened in between is irrelevant.  Here, the time frame to assess Plaintiff's safety in the unit is from after McClendon's transfer to after his return.  The state altered and limited Plaintiff's exposure to danger when it removed McClendon from her unit and then returned the threat to Plaintiff's safety.  Plaintiff's counsel asserted in oral argument that

removing and returning McClendon likely agitated him, or indicated McFaul's weaknesses, thus returning the inmate to Plaintiff's unit at a heightened level of danger.

The Court is not persuaded by Defendants' assertion that this case cannot be distinguished from DeShaney. The Court finds distinctions do exist. In contrast to DeShaney and Bukowski v. City of Akron, 326 F.3d 702 (6th Cir. 2003), where state protective workers or police officers took temporary custody of the ultimate victims and returned them to a preexisting risk of violence because a lack of evidence and/or authority to retain custody of the victim, in this case, the state had absolute authority over the custody of the perpetrator. Further, the state actors were not faced with the need to balance intervention into a family situation with the need to protect a vulnerable victim.

Plaintiff's claim is better examined in the context of case law addressing violence to prison employees by prison inmates. Claims advanced in that context have not necessarily failed on the affirmative act prong of the test. For example, in L.W. v. Grubbs, 974 F.2d 119, 122 (9th Cir. 1992), the appellate court found that state employees committed an affirmative act when they assigned an inmate to work with the plaintiff, and in doing so gave him the opportunity to rape her. The court focused on what the defendants did that "created the opportunity for and facilitated" the inmate's attack on the plaintiff. Id. In this circuit, claims involving prison employees injured by prisoners have rarely addressed the affirmative act prong of the test directly. Most recently, in Sperle v. Michigan Dep't of Corrections, 297 F.3d 483, 493 (6th Cir. 2002), the appellate court considered a state-created danger claim under circumstances akin

to those presented here.  The victim in <u>Sperle</u>, who worked as a storekeeper in the prison store, was murdered by an inmate.  The court examined whether the defendants had rendered the victim "more vulnerable to danger."  After reviewing the evidence, the court found the evidence suggested that the standard was met and therefore "assumed, without deciding" that the defendants' conduct increased the danger to the correctional officer who was killed by an inmate." <u>Id.</u>, at 493.  Based on <u>Sperle</u>, the Court finds it should not award Defendants summary judgment on this ground.

## 2. Requisite Degree of Culpability

A review of case law analyzing this issue makes clear a state actor "must have known or clearly should have known that his actions specifically endangered an individual" in order to possess the requisite degree of culpability.  <u>Kallstrom</u>, 136 F.3d at 1066.  <u>See</u> <u>McQueen v. Beecher Community Schools</u>, 433 F.3d 460, 469-70 (6th Cir. 2006) (finding a teacher did not act with the requisite degree of culpability when she left a group of students alone, including a student who had previous engaged in violence against other students, because even the past behavioral problems would not allow the conclusion that the teacher knew the problem student would shoot and kill another if left alone for a few minutes).

In <u>Sperle</u>, 297 F.3d 483 at 493, the court explained that the state actor must "know of and disregard an excessive risk" and that the official "must both be aware of facts from which the inference could be drawn . . . and he must draw the inference." The court held that the prison officials did not act with deliberate indifference even though they failed to take all safety precautions to protect the store clerk, because

deliberate indifference is not a "should have known" standard.  Id.  The defendants were

not held to have known the high level of danger the inmate posed to the plaintiff

because, even though the she asked the inmate to be removed from working with her,

because, among other things, she still interacted with him.  Id.

　　　The Sixth Circuit reached a different conclusion in Waller v. Trippet, No. 01-

2716, 2002 U.S. App. LEXIS 21502, at *12 (6th Cir. Oct. 10, 2002).  The appellate court

held that the defendant acted with the requisite degree of culpability when he

implemented policies that resulted in the death of a prison employee.  Specifically, the

court found that the defendant disregarded known or obvious risks when he allowed an

inmate access to knives, his weapon of choice, and that inmate later stabbed a prison

employee to death.  In addition, the facts revealed that the employee had previously

complained about the inmate, and the inmate's criminal record indicated that he had

committed several crimes at knifepoint.  Id.

　　　In the present case a reasonable jury could find that both Randall-Owens and

Jackson knew the danger that McClendon posed to McFaul.  Similar to the plaintiff in

Waller, who had expressly indicated her fears about the inmate that later stabbed her,

McFaul told Randall-Owens that she feared for her safety, and would walk around the

unit nervous at all times, clutching a pen or keys as protection.  McFaul also alleges that

Randall-Owens became even more aware of her concern about McClendon after

learning that McFaul went to Deputy Warden White about the transfer.

　　　Jackson should have known and very likely did know the risk McClendon posed

to McFaul.  Jackson had access to McClendon's criminal record, which included several

violent acts towards women.  Further, Jackson indicated to Deputy Warden White that he did not investigate why Randall-Owens refused to transfer McClendon.  Pl. Ex. 4 p. 22, 34, 36-37.  Although a failure to investigate alone would not meet the standard, deliberate ignorance does not shield Jackson.  Compare Sperle, 297 F.3d at 493 (finding the standard was not met when Jackson, who also was a defendant in Sperle, refused to make himself available to an inmate who wanted to warn the warden about a threat).  White stated that he and Jackson spoke about McClendon's transfer and that White "explained what the situation was."  Jackson replied, "We don't protect officers from prisoners."   Because the testimony indicates the existence of a genuine issue of material fact as to whether either or both Defendants had knowledge of the risk McClendon posed to McFaul, the Court declines to award summary judgment on this ground.

### 3.    Qualified Immunity

Defendants maintain that even if a constitution violation occurred they are entitled to qualified immunity.  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  The United States Supreme Court established a two-prong test to determine if a defendant is entitled to qualified immunity.  An individual is not entitled to qualified immunity if the plaintiff can show that: (1) the defendant violated the plaintiff's constitutional rights; and (2) the constitutional right was clearly established at the time of the violation. Saucier v. Katz, 533 U.S. 194, 201-202 (2001).  To defeat qualified immunity, the plaintiff must show that the violated right was a "clearly established

statutory or constitutional right of which the reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

The test for whether an official is entitled to qualified immunity is one of "objective reasonableness," which requires "a reasonably competent public official [to] know the law governing his conduct."  Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). Moreover, the right alleged to have been violated must have been "clearly established" in a particularized sense:   "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations omitted).  Nevertheless, "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope, 536 U.S. 741.

In determining whether the law was clearly established, courts examine "federal constitutional, statutory or case law existing at the time."  Dominque v. Telb, 831 F.2d 673, 677 (6th Cir. 1987).   The Court looks "first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth Circuit], and finally to cases from other circuits.  Higgason v. Stephens, 288 F.3d 868, 876 (6th Cir. 2002).

In this case, the appropriate question is the objective inquiry into whether a reasonable officer could have believed that rescinding a transfer of a prisoner threatening to a correctional officer and returning that prisoner to the correctional

officer's unit was lawful, in light of clearly established law.  The parties do not cite to any Supreme Court decision directly on point.  Accordingly, the Court directs its attention to case law from the Sixth Circuit.

Notably, in the <u>Sperle</u> case, the court "assumed, without deciding, that the defendants's [sic] actions and omissions increased the danger of Tammy Sperle being harmed [and ultimately killed] by an inmate at the prison."  <u>Sperle</u>, 297 F.3d at 493. Although the court dismissed the state-created danger claim because the defendants[1] lacked the requisite degree of culpability, the Court's language suggests that a failure to heed warnings and to provide adequate protection to prison employees may constitute an affirmative act.  <u>See also</u> <u>Ewolski v. City of Brunswick</u>, 287 F.3d 492 (6th Cir. 2002) (assuming the affirmative act requirement was met where the police escalated the confrontation in an armed stand-off).  Likewise, the opinion in <u>Waller</u>, 2002 WL 31296347 at *5, is relevant to Defendants' claim of qualified immunity because the Sixth Circuit recognized in that case that the failure to remove a dangerous prisoner that tormented, and later killed, the plaintiff constituted a sufficient basis to state a claim for state-created danger.  The court nevertheless dismissed the lawsuit on the basis of qualified immunity, holding that case law from the "period after <u>DeShaney</u>, but before the [decedent's] death," would not have given notice to the defendant that his conduct would have violated the decedent's substantive due process rights.

The Court finds that even after <u>Waller</u>, a reasonable prison official may not have

---

[1]The Court is cognizant that Jackson was a defendant in the <u>Sperle</u> case.  The case failed on the merits, and the Court does not hold him to a higher standard for purposes of qualified immunity than it would hold any reasonable prison official.

understood that the conduct at issue here violated established law. The <u>Waller</u> decision is unpublished. Although the lower court's ruling in <u>Waller v. Trippet</u>, 179 F. Supp.2d 724 (E.D. Mich. 2001), is a published opinion, other facts made the decision distinguishable. The lower court held that the defendant in <u>Waller</u> created a danger when he enacted a policy in contradiction of a state-wide policy and provided a violent prisoner with access to weapons and an opportunity to attack the prison employee. <u>Id.</u> at 732. Therefore, despite the shared similarities–neither prison officials considered the specific threat of danger an inmate posed to the plaintiff, this Court is reluctant to reach the conclusion that the law is clearly established. The Sixth Circuit rarely has found the standard met, and the one case in which a plaintiff successfully advanced the state-created danger claim, <u>Kallstrom</u>, 136 F.3d 1055, 1063 (releasing private information from undercover officers' files to defense counsel representing gang members investigated by the officers constituted an affirmative act), is so distinct factually as to fail to give notice that the conduct at issue violates established law. In sum, <u>Sperle</u> is not sufficiently clear as to the affirmative act requirements and the court of appeals did not see fit to issue <u>Waller</u> as a published opinion.

Given the dearth of authority holding the conduct in question violates the Constitution, the Court declines to hold that the law was so clear that a reasonable prison official would have know that Defendants' conduct transgressed constitutional bounds. Therefore, the Court grants Defendants' request for summary judgment on the § 1983 claim on the basis of qualified immunity.

**B. State claims**

Before addressing the merits of the state claims, the Court must consider whether it should exercise jurisdiction over the claims. Defendants contend that the Court should decline to do so.

Section 1367 of the United States Code gives courts the ability to exercise jurisdiction over state claims that "form part of the same case or controversy" as the federal claim. 28 U.S.C. § 1367. This provision codified the Supreme Court's ruling in United Mine Workers v. Gibbs, 383 U.S. 715 (1966), allowing federal courts to exercise jurisdiction over state claims that arise from a common nucleus of operative fact with the federal claim.

It is undisputed that this Court has original jurisdiction over the § 1983 claim. Because the federal claim and the state claims arise out of Randall-Owen's refusal to remove McClendon, the subsequent removal of and return of McClendon to Plaintiff's unit, and the subsequent attack, this Court is free to exercise jurisdiction over the state claims. It finds the interests of justice are better served by retaining jurisdiction, even if the federal claim is dismissed.

### 1. Gross Negligence

Under Michigan law, state employees acting under the color of state authority are immune from civil liability unless they act with gross negligence. MICH. COMP.L. § 691.1407. Gross negligence is defined by state statute as "conduct so reckless that it demonstrates a substantial lack of concern for whether an injury results." Id. To establish a claim for gross negligence, McFaul must satisfy four elements: (1) duty; (2) breach; (3) causation; and (4) harm. Because Defendants only challenge the third

element, the Court directs its attention to whether Defendants' actions were the proximate cause of Plaintiff's injuries. It finds that McFaul cannot, as a matter of law, establish that they were.

The Supreme Court of Michigan defines proximate cause as "the one most immediate, efficient, and direct cause preceding an injury, not 'a' proximate cause." Robinson v. City of Detroit, 613 N.W.2d 307, 311 (Mich. 2000). Under Michigan Supreme Court precedent there can be only one proximate cause. Id. at 313. Accord Livermore v. Lublan, 476 F.3d 397, 409 (6th Cir. 2007) (applying the same proximate cause standard to Michigan gross negligence claims).

Even though Randall-Owens and Jackson may have contributed to McFaul's injuries by returning McClendon to her unit, McClendon was ultimately the most "immediate, efficient, and direct" cause of McFaul's injuries. Accord, Robinson v. City of Detroit, 613 N.W.2d at 313 (finding that the proximate cause of a boy's death was not the police officers involved in the car chase, but rather the driver's reckless conduct). Therefore, McFaul is unable to establish a claim for gross negligence, and Defendants are entitled to summary judgment on this claim.

## 2. Intentional Infliction of Emotional Distress

Plaintiff brings her intentional infliction of emotional distress (IIED) claim against Randall-Owens. To establish a claim for IIED, Michigan law requires that a plaintiff must show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. Roberts v. Auto-Owners Ins. Co., 374 N.W.2d 905, 908 (Mich. 1985).

In the present case, Plaintiff alleges that Defendant Randall-Owens intentionally terrorized her by keeping McClendon in her unit despite multiple requests to remove him because he was stalking and marquetting her.[2]  She further ensured that McClendon be returned to the unit after Deputy Warden White authorized his removal. Although a decision to transfer inmates is discretionary, it is considered common practice at MCF.

Courts define extreme and outrageous conduct as being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Bhama v. Bhama, 425 N.W.2d 733, 735 (Mich. Ct. App. 1988).  Insults, threats, and annoyances are not sufficient.  Id.  The Sixth Circuit has interpreted the claim to require that an employee prove her employer committed a deliberate act and "specifically intend[ed] an injury" in order for an employee to recover under an IIED claim.  Sperle, 297 F.3d at 496.  Courts also consider the relative relationship between the parties, especially if the defendant is in a position of authority over the plaintiff, when evaluating extreme and outrageous conduct.  Warren v. June's Mobile Home Village & Sales, Inc., 289 N.W.2d 380, 383 (Mich. Ct. App. 1976).

The evidence, viewed in the light most favorable to Plaintiff, shows that Randall-Owens did more than name-call or threaten, she used a prisoner to intimidate Plaintiff, forced Plaintiff to keep working in close proximity to that prisoner, and kept Plaintiff in a

---

[2] At oral argument, Plaintiff's counsel explained that Michigan prison officials and staff use the term "marquetting" when a prisoner stares at another individual for an extended period of time.

state of constant fear whenever she was on duty.  Plaintiff complained at least twice to Randall-Owens, and after Randall-Owens' last refusal, Plaintiff found the inmate's presence so troubling that she went over Randall-Owens's head to White, who then ordered the transfer.  Randall-Owens knew that McClendon frightened Plaintiff, and that she felt threatened, but Randall-Owens still refused to transfer him out of Plaintiff's unit. Further, Randall-Owens went so far as to go to Defendant Jackson to undo White's transfer of McClendon, even though transferring inmates was a common occurrence at MCF.

Therefore, the Court denies Defendant Randall-Owens's motion for summary judgment on the IIED claim.  Plaintiff has presented sufficient evidence to show a genuine issue of material fact exists, and has therefore met the burden necessary to survive summary judgment.

## IV.  CONCLUSION

For the reasons stated, the Court **GRANTS** summary judgment as to Plaintiff's § 1983 and gross negligence claims and **DENIES** Defendants' motion for summary judgment on the remaining state claim.

**IT IS SO ORDERED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

Dated: October 22, 2007

**CERTIFICATE OF SERVICE**

Copies of this Order were sent to counsel of record on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt
Deputy Clerk